# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ELAN PAVLOV, individually and on behalf of all others similarly situated, | **No.** |
| *Plaintiff,* | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, DUNBAR LLC, and DUNBAR GROUP LLC, | |
| *Defendants.* | |

## I.  INTRODUCTION

1.     This class action challenges the systemic breaches by Defendant Wilmington Savings Fund Society, FSB ("WSFS") of its obligations to named beneficiaries of WSFS accounts.

2.     When an account holder names a beneficiary on their account, WSFS is legally obligated to transfer control of the account to the named beneficiary once certain conditions are met—typically, when the account holder dies (for a payable-on-death account) or the named beneficiary reaches the age of majority (for a custodial account).

3.     Beneficiary accounts come in many forms. For a payable-on-death account, ownership of an account automatically transfers to the named beneficiary upon the death of the original owner. For a custodial account owned by a minor, once the minor beneficiary reaches the age of majority, control over the account transfers to that beneficiary automatically, by operation of law.

4.     In addition to payable-on-death and custodial accounts, WSFS maintains other types of beneficiary accounts which suffer from the same systemic breaches alleged herein.

5.     WSFS routinely fails to grant beneficiaries access to accounts that are rightfully theirs, to provide beneficiaries with the periodic account statements, disclosures, and notices required by federal law, and to escheat abandoned accounts. WSFS routinely permits unauthorized users to execute transactions, withdraw funds, or otherwise exercise unauthorized control over accounts that legally belong to beneficiaries. As a result of WSFS' failures, countless named beneficiaries are kept in the dark about funds owed to them and denied rightful access to their property. Many beneficiaries never find their funds.

6.     These failures stem from WSFS' neglect in maintaining accurate beneficiary records about its account holders, in violation of WSFS' "Know Your Customer" (hereinafter, "KYC") obligations. WSFS is duty-bound to retain essential facts about its customers, including the identity of those who have authority to act on their customers' behalf with respect to the management of accounts. WSFS systematically fails to maintain essential facts about the beneficiaries of its customers' accounts.

7.     To compensate for its KYC failures, WSFS engages third-party vendors, such as Defendants Dunbar LLC and Dunbar Group LLC (collectively, "Dunbar"), to obtain information about named beneficiaries that WSFS was obligated to know in the first place.

8.     Pursuant to its contract with WSFS, Dunbar locates named beneficiaries and attempts to extract money from those beneficiaries to access property that is lawfully theirs. Dunbar does not reveal to beneficiaries the financial institutions where those beneficiaries' accounts are located. Nor does Dunbar provide any other information that would permit the beneficiaries to access their property on their own. Dunbar refuses to provide any such information until beneficiaries agree, in writing, to forfeit a percentage of the proceeds that are "recovered."

9.     Dunbar's business model thus involves extorting money from account owners in order to "reunite" them with property that legally belongs to them. Dunbar's predatory practices are possible only because WSFS neglects to maintain up-to-date records about its account beneficiaries.

10.    WSFS' and Dunbar's actions are emblematic of industry-wide practices. Financial institutions regularly fail to maintain records about named account beneficiaries, to notify those beneficiaries when accounts become dormant or abandoned, and to provide those beneficiaries with periodic statements of their accounts. Instead of abiding by their KYC obligations, financial institutions engage third-party vendors like Dunbar that impose opaque, unnecessary, and predatory recovery steps that are purportedly designed to "assist" beneficiaries.

11.    Plaintiff Elan Pavlov is a victim of these systemic failures. Pavlov was the named beneficiary on a payable-on-death savings account maintained by his late grandmother, Nita Quint, at a Philadelphia, Pennsylvania branch of WSFS. When Ms. Quint died in 2019, Pavlov became the legal owner of that account. Yet Pavlov did not even learn of the existence of that account until 2025.

12.    WSFS failed to release the funds in that account to Pavlov upon Ms. Quint's death, as WSFS was required to do. WSFS also failed to provide Pavlov with periodic statements of that account, as required by federal law. WSFS instead continued to send the required statements and disclosures to someone that WSFS knew was deceased. WSFS held onto the account for six years, during which time Pavlov had no knowledge that he was the legal owner of a savings account at WSFS.

13.    Instead of fulfilling its duties to Pavlov, WSFS designated the account as "dormant" and hired Dunbar to prevent the account from escheatment to state authorities—a process that

would have allowed Pavlov to readily access his property, free of charge. Under Pennsylvania abandoned property laws, dormant accounts must be transferred to the state after three years of inactivity, at which point such accounts are presumed "abandoned."

14.    Dunbar contacted Pavlov and sought to extract money from him to "recover" an account that was rightfully his. Dunbar did not reveal to Pavlov that the account was administered by WSFS. Nor did Dunbar provide any other information that would have permitted Pavlov to locate the account.

15.    The above-described practices breached WSFS' duties to named beneficiaries, violated the Federal Electronic Fund Transfer Act, and gave rise to additional state law and common law claims.

16.    Plaintiff brings this class action on behalf of himself and similarly affected beneficiaries to recover access to accounts that Defendants have wrongfully withheld from them, to obtain damages to compensate them for the denial of their property, and to secure injunctive relief preventing future misconduct.

## II.    THE PARTIES

17.    Plaintiff Elan Pavlov is an individual domiciled in Cambridge, Massachusetts.

18.    Defendant Wilmington Savings Fund Society, FSB is a federal savings bank whose headquarters and principal place of business are located in Wilmington, Delaware.

19.    Defendant Dunbar LLC is a Nevada limited liability company. On information and belief, Dunbar LLC's principal place of business is in Las Vegas, Nevada.

20.    Defendant Dunbar Group LLC is a Pennsylvania limited liability company with a principal place of business in King of Prussia, Pennsylvania.

21.     On information and belief, Dunbar LLC and Dunbar Group LLC effectively operate as one entity that contracts with financial institutions to perform "beneficiary outreach" on a nationwide basis. Seth Schoor serves as the Chief Executive Officer and "Founder" of both companies, for example.

### III.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because "minimal diversity" exists; at least one member of the putative class is a citizen of a state different from any defendant. Minimal diversity is satisfied here because the named Plaintiff is a citizen of Massachusetts, WSFS is a Delaware corporation, Dunbar LLC is a Nevada limited liability company, and Dunbar Group LLC is a Pennsylvania limited liability company. Additionally, the proposed class exceeds 100 members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(d)(5)(B), (d)(6).

23.     This Court also has federal-question jurisdiction under 28 U.S.C. § 1331 because the Complaint asserts a claim arising under the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq*.

24.     This Court may exercise specific personal jurisdiction over Defendant WSFS under Pennsylvania's long-arm statute, 42 Pa. C.S. § 5322(a)(1)-(4), because WSFS transacted business and supplied services in Pennsylvania by administering the account at issue through its Pennsylvania operations. WSFS purposefully directed its activities at the Commonwealth of Pennsylvania by administering a bank account in Pennsylvania, and this litigation arises out of those activities.

25.    The Court may exercise specific personal jurisdiction over Dunbar LLC pursuant to 42 Pa. C.S. § 5322(a)(1)-(4) because Dunbar LLC purposefully availed itself of Pennsylvania law by contracting to perform outreach tied to a WSFS account held at a branch in Philadelphia, Pennsylvania. Dunbar LLC specifically represented that its process was designed to ensure the account was "not surrendered to the state"—i.e., to the Commonwealth of Pennsylvania. By doing so, Dunbar LLC transacted business, contracted to supply services in Pennsylvania, and caused harm within Pennsylvania.

26.    This Court has general personal jurisdiction over Defendant Dunbar Group LLC because Dunbar Group LLC is a Pennsylvania corporation with its principal place of business in Pennsylvania.

27.    Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including WSFS' administration of the Pennsylvania-based account and Dunbar's outreach regarding an account registered through WSFS' Philadelphia branch.

## IV.    FACTUAL ALLEGATIONS

### A.  WSFS mishandles beneficiary identification and deprives beneficiaries of access to their accounts.

28.    WSFS represents to its customers that "A Payable on Death (P.O.D.) Account or an Account with listed beneficiaries is an account payable to the Account Holder during his or her lifetime…. When the Account Holder dies (or if a Joint Account, when all Account Holders die), the Account is owned by the P.O.D. payee(s) or beneficiaries." Accordingly, WSFS represents that ownership of a beneficiary account passes to the named beneficiary automatically upon the death of an account holder. From that moment forward, WSFS is required to recognize the beneficiary as the sole account holder and communicate exclusively and directly with them.

6

29.     WSFS further represents that custodial accounts opened for minor beneficiaries under state law variants of the Uniform Transfers to Minors Act ("UTMA") are governed by those laws, and that "[d]eposits in the account will be held by us [WSFS] for the exclusive right and benefit of the minor."

30.     For example, under Pennsylvania's UTMA (20 Pa. C.S. §§ 5301–5321), such custodial accounts are managed exclusively for the minor's benefit until the minor reaches the statutory age of majority, 21 years old. Upon the minor beneficiary turning 21 years old, custodial authority terminates, and full legal control of the account transfers immediately and by operation of law to the beneficiary. From this moment, WSFS is required to recognize the beneficiary as the sole account holder and communicate exclusively and directly with them.

31.     Federal law imposes additional, complementary obligations on WSFS. Specifically, the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.*, mandates that financial institutions like WSFS must provide account owners with periodic statements on at least a quarterly basis, which document all transactions, charges, and fees related to the account. Pursuant to EFTA, WSFS is required to begin providing periodic account statements to the named beneficiary as soon as that beneficiary assumes legal control or ownership of the account.

32.     EFTA's periodic-account-statement requirement furthers the public policy behind the statute: promoting transparency, protecting consumers, and reducing fraud in banking. The provision of regular statements empowers account owners to monitor their accounts, detect unauthorized activity, and identify errors in a timely manner. This oversight mechanism also requires financial institutions to notify account beneficiaries that they have assumed legal control over their accounts.

33.    WSFS is also subject to state unclaimed property laws. Under these laws, dormant accounts—those without any account activity or direct owner communication for a designated period of time—must be reported and transferred, (i.e., "escheated"), to state treasuries for safekeeping. Escheatment is a mechanism that allows state departments of unclaimed property to reunite individuals with their property. Escheatment is made to the state of last known address of the property's owner. Unclaimed property laws require financial institutions, including WSFS, to review their records each year to determine whether they have any accounts reportable as abandoned or unclaimed, to make an annual report of their findings, and to annually escheat any abandoned or unclaimed account funds to the state.

**B.    WSFS mishandled Plaintiff's account and deprived Plaintiff of access to his account.**

34.    Plaintiff Elan Pavlov was the named beneficiary of a WSFS payable-on-death savings account opened by his late grandmother, Nita Quint.

35.    Ms. Quint died in 2019. WSFS received and processed Ms. Quint's death certificate in both November 2019 and again in November 2021.

36.    Upon information and belief, WSFS regularly receives notifications of individuals who have been reported as deceased through the Death Master File, a database maintained by the United States Social Security Administration.

37.    After receiving notification of Ms. Quint's death, WSFS failed to: notify Plaintiff of his ownership interest in the account, provide Plaintiff with the ordinary incidents of ownership of that account, provide Plaintiff with an IRS 1099 form, and provide Plaintiff with periodic statements of account. WSFS was legally obligated and duty-bound to take each of these actions.

38.    Although WSFS knew that Plaintiff was listed as the beneficiary on the account and that Nita Quint was deceased, it failed to maintain accurate beneficiary records or up-to-date contact information.

39.    WSFS did not send statements, notifications, and disclosures to Plaintiff. Instead WSFS continued to send these to someone who WSFS knew was deceased.

40.    WSFS internally classified the account as "dormant" as of January 11, 2021 (long after it should have been so designated) without ever notifying Plaintiff of the account's existence, or providing him with any statements of account. In fact, Mr. Pavlov explicitly asked WSFS for account statements, to which he was entitled, but which WSFS refused to provide. WSFS's refusal to provide Mr. Pavlov with account statements to which he was entitled constituted, among other things, an act of concealment by WSFS.

41.    As a result of WSFS' failures, Plaintiff had no knowledge that he owned an account at WSFS, for years. WSFS nonetheless continued to charge maintenance fees on the account, enriching itself at the expense of Plaintiff. WSFS also charged Plaintiff an escheatment fee.

42.    In 2024, WSFS included Mr. Pavlov's account in its escheatment reporting to the Commonwealth of Pennsylvania, but failed to identify and disclose Mr. Pavlov's ownership over the funds. In April 2025, WSFS placed the funds into the state's custody without notifying Mr. Pavlov and without attempting to contact him as required by law, constituting yet another act of concealment by WSFS.

43.    On July 16, 2025—years after the account had become dormant and months after it had already been improperly escheated—WSFS acknowledged to Plaintiff in writing that it had remitted his account "to the Commonwealth of Pennsylvania in April 2025," and that it "did not properly identify the beneficiary relationship …. in the escheatment documentation." WSFS

further admitted that the reason it failed to notify him was because "the account had a bad address/return mail status." Plaintiff's account had this status only because of WSFS' KYC failures, including the failure to maintain up-to-date records.

44.    WSFS' KYC failures thus deprived Plaintiff of the chance to receive direct and timely access to his funds, as well as the ability to even learn of the account's existence.

45.    To this date, Plaintiff has never received any statement from the account he owns at WSFS. Nor has he been able to access the funds in his own account.

46.    WSFS' acts and omissions reflect systemic failures in its processes for maintaining beneficiary records, contacting rightful account owners, and accurately performing state-required escheat reporting, leading directly to injury to Plaintiff and similarly situated consumers.

**C. Dunbar's vendor-managed "recovery" workflow obstructed direct reunification and imposed unnecessary hurdles on Plaintiff.**

47.    WSFS fails to abide by its KYC obligations and maintain up-to-date records about account beneficiaries.

48.    Instead of correcting its own internal failures, WSFS contracts with Dunbar, a third-party vendor that purports to specialize in dormant-account management and "recovery" programs. WSFS hires Dunbar to, among other things, locate named beneficiaries.

49.    Dunbar's business model is preventing dormant funds from being "surrendered to the state." In other words, Dunbar prevents funds from entering the protective custody of state unclaimed property programs, which serve the express purpose of alerting rightful owners about their property interests.

50.    Dunbar promotes its services as reducing "escheatment risk" and "improving retention on dormant and unclaimed accounts." In other words, financial institutions are

incentivized to contract with Dunbar to ensure that accounts and account funds remain in the custody of those financial institutions.

51.     According to Dunbar, financial institutions like WSFS supply Dunbar with "the original account information" for accounts that financial institutions have deemed "lost and abandoned." Dunbar's "team of researchers" then "perform extensive research" to locate beneficiaries in order "to facilitate the recovery" of the account.

52.     On information and belief, WSFS provides Dunbar with confidential information about account beneficiaries, including their names, contact details, account numbers, and account balances.

53.     When Dunbar contacts a beneficiary, Dunbar generally does not reveal information sufficient for the beneficiary to locate their dormant account. Nor does Dunbar reveal the financial institution that hired them.

54.     These omissions are purposeful. Dunbar requires beneficiaries to agree, in writing, to forfeit a percentage of the property that is "recovered" before Dunbar will take any steps towards reuniting beneficiaries with their accounts. Only after signing that agreement does Dunbar reveal the identity of its client, and where the beneficiary's property is located.

55.     In other words, Dunbar makes money by charging beneficiaries to access property that rightfully belongs to them, after proactively concealing where that property is. Essentially, Dunbar purchases a treasure map from WSFS, and then charges a ransom to the treasure's rightful owner for the privilege of seeing the map.

56.     Plaintiff Elan Pavlov was a victim of Dunbar's predatory practices.

57.     On April 15, 2025, Dunbar sent Plaintiff a letter, stating: "Dunbar's client—a financial institution—has made us aware of inactive and/or dormant accounts and has engaged our

firm to help find the appropriate heir and/or beneficiary." The letter misleadingly represented that the recovery process "includes multiple steps and significant documentation" and was designed to ensure the account was "not surrendered to the state."

58.     Plaintiff was legally entitled to access and control his own bank account. Dunbar interfered with Plaintiff's property rights by creating artificial barriers between him and his property.

59.     Dunbar's outreach placed Plaintiff into a confusing administrative process that diverted Plaintiff's attention from straightforward paths to direct payment or proper state-facilitated reunification.

60.     On information and belief, the unnamed financial-institution client in Dunbar's letter was WSFS. Dunbar contracted with WSFS to place unnecessary obstacles between Plaintiff and his rightful property, to prevent Plaintiff's account from reaching the state unclaimed-property process, and to compensate for WSFS' failure to maintain up-to-date records about its own customers.

61.     But-for Dunbar's interference, WSFS would have escheated Plaintiff's account to the Commonwealth of Pennsylvania at an earlier date, a process that would have permitted Plaintiff to access his own property free of charge.

62.     WSFS engaged Dunbar to carry out "pre-escheatment outreach" on WSFS' behalf, with the purpose and effect of hampering Plaintiff's rights to access his account. Dunbar acted with WSFS' authority, for WSFS' benefit, and as WSFS' agent; WSFS directed, controlled, and/or ratified Dunbar's outreach methods and scripts, including Dunbar's stated goal of ensuring accounts are "not surrendered to the state."

63.    Dunbar sent Plaintiff, along with the letter, a packet of information describing Dunbar's process, which included the following:

**How did you get my information?**
Dunbar is provided a list of lost and abandoned accounts by our clients and civic institutions. After being supplied the original account information, Dunbar's team of researchers perform extensive research to locate you and an Account Specialist is assigned to your case to facilitate the recovery of this account.

**How much will it cost me?**
There is no up-front cost to you. Dunbar will collect a percentage of the proceeds recovered if we are successful in reuniting you with the abandoned funds. If Dunbar is unsuccessful in the recovery of the asset, there is no fee.

**Why should I pay Dunbar a contingency fee?**
Dunbar will manage the entire recover process from start to finish with an experienced account specialist assigned to your case.  We prepare all the recovery forms and legal documents which are necessary to have the funds recovered, preventing you from having to spend hours on hold with state and financial institutions.  Our research and recovery departments will order all court documents and vital records to establish entitlement and follow up on your behalf to assure the claims are being processed in a timely manner.

**How does this happen?**
Dunbar is not made aware as to the specifics which lead to this asset becoming lost or abandoned. Our goal is to simply reunite these funds with the rightful owners or heirs.

**What is the process?**
Once Dunbar receives a signed agreement to work on your behalf, we will prepare and send the necessary recovery forms and legal documents. Dunbar will submit all the documents on your behalf and continue to monitor the claim until it is processed.

64.    Dunbar claims to have "helped thousands of rightful owners collect millions of dollars they otherwise wouldn't have received." Dunbar's predatory practices constitute a deliberate interference to the rights of Plaintiff and similarly situated beneficiaries to access accounts that are rightfully theirs.

65.    On information and belief, Dunbar's relationship with WSFS—including the governing contract—is centered in Delaware.

66.    On information and belief, and based on the business model described above, Dunbar has reached similar contractual arrangements with other institutions that have systematically failed to maintain up-to-date records about account beneficiaries.

### D. WSFS wrongfully disclosed to Dunbar, and Dunbar wrongfully solicited from WSFS and other institutions, beneficiaries' nonpublic personal information.

67.     WSFS collected, maintained, and used Plaintiff's nonpublic personal information ("NPPI"), including his name, social security number, contact details, identifying information, decedent-linkage data, account balance, and internal account identifiers.

68.     WSFS owed duties of confidence to safeguard Plaintiff's NPPI and to refrain from disclosing or using it beyond limited, necessary servicing in aid of account transfer.

69.     However, WSFS disclosed to Dunbar, and Dunbar solicited from WSFS, Plaintiff's NPPI.

70.     WSFS never provided notice to Plaintiff that WSFS intended to, or did in fact, disclose Plaintiff's NPPI to any commissioned "recovery" vendor, including Dunbar, as required by law.

71.     WSFS breached its duty of confidence to Plaintiff by disclosing his NPPI to Dunbar without consent or adequate authorization and for Dunbar's independent commercial use—including to identify and solicit Plaintiff for a contingency-fee "recovery" process—rather than for a constrained, one-time administrative function.

72.     The disclosure exceeded any permissible servicing purpose because, *inter alia*, Dunbar (a) operated on a contingency-fee model for its own account, (b) used NPPI to target and pressure Plaintiff with fee-based outreach, (c) retained and deployed NPPI for marketing rather than a strictly limited operational task, and (d) continued to use the NPPI and to solicit business from Plaintiff after the termination of the relationship with WSFS.

73.     On information and belief, and based on Dunbar's business model and its claims to have "helped thousands of rightful owners collect millions of dollars they otherwise wouldn't have received," Dunbar likewise solicited and obtained similarly situated beneficiaries' NPPI from a

host of financial institutions, including but not limited to WSFS, without those beneficiaries' authorization.

    **E.  WSFS' failures are systematic in the financial industry.**

    74.    WSFS' failure to maintain adequate records about the named beneficiaries of its account holders exemplify a systemic failure within the financial industry.

    75.    In 2019, the Financial Industry Regulatory Authority ("FINRA") sanctioned several national broker-dealers—including Citigroup Global Markets, J.P. Morgan Securities, LPL Financial, Morgan Stanley Smith Barney, and Merrill Lynch (collectively, the "Firms")—for supervisory failures regarding custodial accounts under FINRA Rule 2090.

    76.    FINRA Rules 2090 (the "Know Your Customer" rule) and 4512 (the "Customer Account Information" rule) require FINRA members to maintain accurate account ownership records and to ensure that account information is updated when the status of the account holder changes. Financial institutions must also take reasonable steps to verify account ownership and ensure that former custodians are removed, and that unauthorized personas are not added, as authorized parties when a minor account holder reaches the age of majority. *See* FINRA Rules 2090 & Rule 4512 (2021).

    77.    FINRA concluded that the Firms failed to implement reasonable supervisory systems to track whether custodians timely transferred control of UTMA and Uniform Gifts to Minors Act ("UGMA") accounts to beneficiaries upon reaching the age of majority.

    78.    Due to these supervisory deficiencies, custodians continued authorizing transactions in UTMA and UGMA accounts months or even years after their authority had expired.

    79.    To settle these matters, the Firms collectively paid to FINRA approximately $1.4 million in fines and committed to reviewing and strengthening their supervisory systems. These

regulatory settlements placed the industry on notice of its systemic failures to maintain up-to-date information on account beneficiaries and to timely transfer legal control over accounts to beneficiaries.

80.    These failures extend beyond FINRA members. WSFS and, upon information and belief, other similarly situated banks, have systematically failed to maintain the records necessary to fulfill their legal duties to the named beneficiaries of the accounts that they administer.

81.    The conduct of WSFS violates the public policies underlying state unclaimed-property laws designed to ensure efficient, transparent, and direct reunification of unclaimed financial assets with their rightful owners.

82.    WSFS' practices harm consumers by depriving them of timely access to their own accounts and creating artificial obstacles between beneficiaries and their property.

83.    Through these unfair and deceptive practices, WSFS has unjustly enriched itself by retaining improperly held funds, earning interest on those funds, imposing fees on accounts that are dormant only because of its own negligence, and profiting from unnecessary recovery procedures.

## CLASS ALLEGATIONS

84.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of himself and all others similarly situated, defined as follows:

    a.    "WSFS Class" — All individuals in the United States who were designated as beneficiaries of accounts administered by WSFS, and:

        i.    who did not receive an account statement or other communication notifying the individual of the existence of the account within 90 days of the

      beneficiary reaching the age of majority (in the case of UTMA accounts) or

      the account holder's death (in the case of payable-on-death accounts); or

    ii.  who were not provided with exclusive access to the account within 90 days

       of the beneficiary reaching the age of majority (in the case of UTMA

       accounts) or the account holder's death (in the case of payable-on-death

       accounts); or

    iii.  whose accounts were legally abandoned or unclaimed but not escheated to

       state authorities by WSFS.

b.  "WSFS Pennsylvania Subclass" — All members of the WSFS Class whose accounts were opened or otherwise maintained within the Commonwealth of Pennsylvania.

c.  "Dunbar Class" — All individuals in the United States:

    i.  from whom Dunbar attempted to extract money before granting access to bank accounts that were legally theirs; or

    ii.  whose NPPI was obtained by Dunbar without the individual's authorization.

d.  "Dunbar Pennsylvania Subclass" — All members of the Dunbar Class whose accounts were opened or otherwise maintained within the Commonwealth of Pennsylvania.

85.    Excluded from the Classes and Subclasses are Defendants, their officers, directors, affiliates, legal representatives, and any entity in which Defendants have a controlling interest, as well as any judge, justice, or judicial officer presiding over this matter and members of their immediate families.

17

## A. WSFS Class

86.    Numerosity — The WSFS Class and WSFS Pennsylvania Subclass are so numerous that joinder of all members is impracticable. On information and belief, thousands of account beneficiaries were affected by the unlawful policies of WSFS. The precise number of the Members of the WSFS Class and WSFS Pennsylvania Subclass can be determined through discovery.

87.    Commonality — There are questions of law and fact common to all WSFS Class and Subclass Members, including but not limited to:

a.    Whether WSFS systematically failed to transfer account control to account beneficiaries in violation of their contractual and legal duties;

b.    Whether WSFS systematically failed to notify account beneficiaries that the beneficiaries had assumed legal control over their accounts;

c.    Whether WSFS's practices breached their duties to account beneficiaries;

d.    Whether WSFS' practices constitute unfair or deceptive business practices under state consumer protection law;

e.    Whether WSFS' failure to provide accurate disclosures and statements to beneficiaries violates the Electronic Fund Transfer Act;

f.    Whether Class Members suffered economic injury from WSFS' misconduct; and

g.    Whether injunctive relief is necessary to prevent WSFS from continuing its unlawful practices.

88.    Typicality — Plaintiff's claims are typical of the claims of the WSFS Class and Subclass, as they arise from standardized policies and practices of WSFS that deprive account owners like him of rightful access to their property.

89.    Adequacy — Plaintiff will fairly and adequately represent the interests of the Class and Subclass. Plaintiff has no interests antagonistic to those of the Class and has retained counsel experienced in class action litigation and cases involving consumer protection and financial fraud.

90.    Predominance — Common questions of law and fact predominate over any individualized issues. WSFS' misconduct resulted from centrally managed policies, ensuring that liability determinations will be uniform across the Class and Subclass. Although damages among Class and Subclass Members will vary, damages will be readily and uniformly calculable using objective data maintained in WSFS' records, such as account-opening dates, balances, fees and interest postings, and delay intervals.

91.    Superiority — A class action is superior to other available methods for the fair and efficient adjudication of the controversy involving WSFS because:

   a.    The damages suffered by individual Class Members are small compared to the cost of litigating each claim individually;

   b.    The legal and factual issues in this case are common to all Class Members, making individual lawsuits inefficient and impractical;

   c.    WSFS' records will provide an administratively feasible mechanism for identifying Class Members; and

   d.    Class-wide relief will promote judicial economy and ensure a uniform resolution of WSFS' liability.

92.    Injunctive Relief (Rule 23(b)(2)) — WSFS continues to maintain control over accounts in violation of beneficiaries' rights. Injunctive relief is necessary to:

a.  Require WSFS to promptly transfer control of all improperly retained accounts belonging to Class Members;

b.  Prohibit WSFS from continuing their deceptive practices regarding account ownership; and

c.  Mandate compliance with state and federal law regarding financial disclosure.

## B.  Dunbar Class

93.    Numerosity — The Dunbar Class and Dunbar Pennsylvania Subclass are so numerous that joinder of all members is impracticable. On information and belief, thousands of property owners were injured by Dunbar's predatory conduct. The precise number of the Members of the Dunbar Class and Dunbar Pennsylvania Subclass can be determined through discovery.

94.    Commonality — There are questions of law and fact common to all Dunbar Class and Subclass Members, including but not limited to:

a.  Whether Dunbar tortiously interfered with the contractual rights of named beneficiaries to access their accounts;

b.  Whether Dunbar's practices constitute unfair or deceptive business practices under state consumer protection law;

c.  Whether Dunbar violated the privacy rights of Class Members by soliciting and obtaining Class Members' NPPI;

d.  Whether Class Members suffered economic injury from Dunbar's misconduct; and

e.  Whether injunctive relief is necessary to prevent Dunbar from continuing its unlawful practices.

95.    Typicality — Plaintiff's claims are typical of the claims of the Dunbar Class and Subclass, as they arise from standardized conduct and practices of Dunbar that interfere with the rights of property owners like him to access their property.

96.    Adequacy — Plaintiff will fairly and adequately represent the interests of the Class and Subclass. Plaintiff has no interests antagonistic to those of the Class and has retained counsel experienced in class action litigation, and cases involving consumer protection and financial fraud.

97.    Predominance — Common questions of law and fact predominate over any individualized issues. Dunbar's misconduct resulted from a company-wide business model and centrally managed business practices, ensuring that liability determinations will be uniform across the Class and Subclass. Although damages among Class and Subclass Members will vary, damages will be readily and uniformly calculable using objective data maintained in Dunbar's records, namely the account balances of, and fees extorted from, Class Members.

98.    Superiority — A class action is superior to other available methods for the fair and efficient adjudication of the controversy against Dunbar because:

    a.  The damages suffered by individual Class Members are small compared to the cost of litigating each claim individually;

    b.  The legal and factual issues in this case are common to all Class Members, making individual lawsuits inefficient and impractical;

    c.  Dunbar's records will provide an administratively feasible mechanism for identifying Class Members; and

    d.  Class-wide relief will promote judicial economy and ensure a uniform resolution of Dunbar's liability.

99.     Injunctive Relief (Rule 23(b)(2)) — Dunbar continues to tortiously interfere with the contractual benefits of property owners. Injunctive relief is necessary to:

a.  Prohibit Dunbar from continuing its deceptive practices regarding "recovery" of property from rightful owners; and

b.  Enjoin Defendants from charging commissions or fees from property owners to access property that rightfully belongs to them;

c.  Mandate compliance with applicable law regarding interference with contractual rights.

## CAUSES OF ACTION

### COUNT I
**Violation of Electronic Fund Transfer Act
(15 U.S.C. Section 1693 *et seq*)
(By Plaintiff and the WSFS Class Against Defendant WSFS)**

100.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

101.    The Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693 *et seq*., and its implementing regulation, Regulation E (12 C.F.R. § 1005 *et seq*.), impose disclosure and notice obligations on financial institutions with respect to all consumer accounts that may be accessed by means of an electronic funds transfer.

102.    Under 15 U.S.C. § 1693d(c), financial institutions are required to provide periodic statements to account holders detailing account activity, to allow consumers to monitor their accounts and detect unauthorized transactions. These account statements must be provided to consumers every three months at a minimum.

103.    WSFS failed to provide the required periodic statements and disclosures to Plaintiff and Class Members.

104.    WSFS failed to implement adequate internal policies and procedures to ensure compliance with EFTA's periodic statement and disclosure requirements.

105.    Plaintiff and Class Members suffered substantial economic damages as a direct and proximate result of WSFS' failures to provide periodic account statements, including but not limited to delayed transfer of ownership/control of their accounts, deprivation of access to funds that were lawfully theirs, loss of privacy, lost investment opportunities, and other consequential losses.

## COUNT II
### Negligence
### (By Plaintiff and the WSFS Class Against Defendant WSFS)

106.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

107.    Plaintiff and Class Members are named beneficiaries of accounts administered by WSFS. Accordingly, Plaintiff and Class Members are not parties to any contracts with WSFS.

108.    WSFS owes Plaintiff and Class Members a duty to act with ordinary and reasonable care. By virtue of the beneficiary relationship, WSFS was reposed with special trust and fiduciary responsibilities over the beneficiary accounts. This relationship put Plaintiff and Class Members in a state of dependence upon WSFS.

109.    The scope of WSFS's duty of care is defined by statutory requirements (including EFTA and state escheatment law) and by examining how other financial institutions could have been reasonably expected to act under similar circumstances.

110.    Specifically, WSFS was duty-bound to maintain accurate beneficiary information and to transfer ownership and control of the accounts to the rightful beneficiaries once they assumed legal control.

111.     Upon the account holder's death, or other agreed triggering event (hereinafter, the "Transfer Trigger"), WSFS was duty-bound to: (1) promptly transfer ownership of the account to the beneficiary; (2) terminate former parties' authority and access to the account; and (3) provide the ordinary incidents of ownership to the beneficiary.

112.     WSFS owed a duty to fulfill its legal obligations in a manner that did not injure Plaintiff's and Class Members' rights—including the timely transfer of ownership and control of the accounts to the beneficiaries upon satisfaction of the triggering conditions (e.g., death of the account holder or other agreed-upon event). Such transfer includes, without limitation, retitling the account into the beneficiary's name, terminating former parties' authority, enabling ordinary incidents of ownership (statements, communications, access credentials, withdrawals), and delivering the funds without unnecessary, fee-based impediments.

113.     WSFS breached its duty of care by, *inter alia*:

a.     Failing to maintain accurate records and information about the beneficiaries of accounts, in violation of WSFS' KYC obligations;

b.     Failing to timely transfer ownership and control of accounts to beneficiaries and to terminate former parties' authority;

c.     Allowing former parties or other unauthorized parties to access accounts;

d.     Failing to provide beneficiaries, upon the Transfer Trigger, with the ordinary incidents of ownership, including exclusive access, account credentials, statements, communications, annual privacy notices, and IRS 1099 forms, as required by law;

e.     Failing to timely report and escheat abandoned accounts to state authorities, as required by law;

24

f.   Failing to notify beneficiaries of the existence of accounts to which they hold legal ownership;

g.   Wrongly classifying accounts as dormant or abandoned without adequate verification and/or failing to code beneficiary status accurately;

h.   Contracting with third-party vendor Dunbar (and/or similar vendors) to impose extortionate "recovery" processes that gate-kept or delayed transfer of accounts to beneficiaries;

i.   Disclosing beneficiaries' NPPI to Dunbar without the beneficiaries' consent or authorization;

j.   Conditioning or steering transfer through a third-party "recovery" vendor and/or attempting to net or deduct any vendor fee from account value owed to beneficiaries;

k.   Omitting disclosure of a no-cost, direct transfer pathway and allowing a vendor to portray transfer/recovery as complex, urgent, and vendor-managed.

114.    Plaintiff and Class Members suffered substantial damages as a direct and proximate result of WSFS' breaches, including but not limited to deprivation of timely ownership and control of their accounts, loss-of-use/interest on account balances during delay, continued or unnecessary fees assessed, incidental out-of-pocket costs, and other consequential losses.

## COUNT III
**Violation of the Delaware Consumer Fraud Protection Act**
**Del. Code tit. 6, § 2511 *et seq.***
**(By Plaintiff, the WSFS Class, and the Dunbar Class Against All Defendants)**

115.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

116.    Defendants' conduct as alleged herein constitutes unfair or deceptive merchandising practices as defined by the Delaware Consumer Fraud Protection Act.

117.    Defendants employed these unfair practices in connection with the receipt of banking services, in the case of WSFS, and with the advertisement of property-location services, in the case of Dunbar.

118.    WSFS' unfair practices include but are not limited to:

a.    Deceiving the original account holders by falsely representing that WSFS would protect the interests of named beneficiaries;

b.    Failing to maintain accurate records and information about the beneficiaries of accounts, in violation of WSFS' KYC obligations;

c.    Failing to timely transfer ownership and control of accounts to beneficiaries and to terminate former parties' authority;

d.    Allowing former parties or other unauthorized parties to access accounts;

e.    Failing to provide beneficiaries, upon the Transfer Trigger, with the ordinary incidents of ownership, including exclusive access, account credentials, statements, communications, annual privacy notices, and IRS 1099 forms, as required by law;

f.    Failing to timely report and escheat abandoned accounts to state authorities, as required by law;

g.    Failing to notify beneficiaries of the existence of accounts to which they hold legal ownership;

h.    Withholding account information from Plaintiff and Class Members;

i.    Concealing the existence of the accounts from Plaintiff and Class Members, thereby depriving them of access to funds that lawfully belonged to them;

j.  Contracting with third-party vendor Dunbar (and/or similar vendors) to impose extortionate "recovery" processes that gate-kept or delayed transfer of accounts to beneficiaries;

k.  Contracting with third-party vendor Dunbar (and/or similar vendors) to extract money from Plaintiff and Class Members to access accounts that lawfully belonged to them;

l.  Disclosing beneficiaries' NPPI to Dunbar without the beneficiaries' consent or authorization;

m.  Conditioning or steering transfer through a third-party "recovery" vendor and/or attempting to net or deduct any vendor fee from account value owed to beneficiaries;

n.  Omitting disclosure of a no-cost, direct transfer pathway and allowing a vendor to portray transfer/recovery as complex, urgent, and vendor-managed;

o.  Aiding-and-abetting Dunbar's concealment of financial information and attempted extraction of funds from Plaintiff and Class Members.

119.  Dunbar's unfair practices include but are not limited to:

a.  Contacting Plaintiff and Class Members to inform them that they were beneficiaries of bank accounts without divulging the identity of the financial institution where that account was held or otherwise providing information sufficient for account owners to identify their property;

b.  Soliciting Plaintiffs' and Class Members' NPPI from various financial institutions without those beneficiaries' consent or authorization;

27

    c.   Attempting to extract money from Plaintiff and Class Members as a condition of gaining access to property that they lawfully owned;

    d.   Failing to disclose to Plaintiff and Class Members that they had a right to access their property free of charge;

    e.   Preventing dormant or abandoned accounts from being timely escheated to state authorities.

120.    The unfair practices that form the basis for the claims brought by Plaintiff and Class Members occurred partially or wholly within the state of Delaware, including WSFS' systematic failures to transfer legal control over accounts to beneficiaries and WSFS' contractual arrangement with Dunbar. WSFS is a Delaware Bank and Dunbar regularly conducts business in Delaware.

121.    As a direct and proximate result of Defendants' unfair practices, Plaintiff and Class members suffered substantial injury including, but not limited to, delayed transfer of ownership/control of their accounts, deprivation of access to funds that were lawfully theirs, loss of privacy, lost investment opportunities, and other consequential losses.

122.    These substantial injuries were the reasonably foreseeable result of Defendants' unfair practices, were not reasonably avoidable by consumers themselves, and are not outweighed by any countervailing benefits to consumers or competition.

**COUNT IV**
**Conversion**
**(By Plaintiff and the WSFS Class Against Defendant WSFS)**

123.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

124.    Upon the occurrence of the Transfer Trigger for each account (including, without limitation, the account holder's death or the beneficiary's attainment of the agreed age of majority),

28

Plaintiff and Class Members became the sole legal owners with the immediate right to exclusive possession and control of their accounts and the specific, identifiable funds reflected in those accounts on WSFS' ledgers.

125.    Despite beneficiaries' superior rights, WSFS wrongfully exercised dominion and control over those specific funds, including, *inter alia*, by:

    a.    Debiting, assessing, or collecting fees (e.g., "maintenance," "dormancy," "service," "escheatment," or similar charges) after the Transfer Trigger without the authorization, consent, or notification of the beneficiaries who then held legal control;

    b.    Netting, deducting, or diverting any third-party "recovery" or vendor commission from account value owed to beneficiaries; and

    c.    Withholding or otherwise failing to relinquish exclusive control of the accounts and funds in a manner inconsistent with beneficiaries' ownership rights, including delaying retitling and impeding beneficiaries' ordinary incidents of ownership.

126.    These acts constitute an unauthorized interference with the specific, identifiable monies of Plaintiff and Class Members and are inconsistent with their immediate right to possession and control, thereby constituting conversion.

127.    As a direct and proximate result of WSFS' wrongful conduct, Plaintiff and Class Members have been deprived of the use and benefit of their property and have suffered damages, including but not limited to wrongfully deducted fees and charges, loss-of-use/interest on account balances during the period of wrongful control, and incidental out-of-pocket costs.

**<u>COUNT V</u>**
**Unjust Enrichment**
**(By Plaintiff and the WSFS Class Against Defendant WSFS)**

128.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

129.     Upon the occurrence of the Transfer Trigger for each account (including, without limitation, the account holder's death or the beneficiary's attainment of the agreed age of majority), Plaintiff and Class Members became the sole legal owners with the immediate right to exclusive possession and control of their accounts and the specific funds reflected on WSFS' ledgers.

130.     Notwithstanding beneficiaries' superior rights, WSFS retained control and use of those accounts and funds and derived benefits therefrom.

131.     Plaintiff and Class Members did not consent to WSFS' retention or use of their property after the Transfer Trigger and received no benefit in return.

132.     It would be unjust and inequitable to permit WSFS to retain the financial benefits derived from funds and accounts that rightfully belonged to Plaintiff and Class Members.

133.     Plaintiff and Class Members are therefore entitled to restitution and disgorgement of all amounts wrongfully retained, collected, or earned by WSFS through their post-trigger control and use of beneficiaries' accounts and funds, together with pre- and post-judgment interest and such other equitable relief as the Court deems just and proper.

**<u>COUNT VI</u>**
**Breach of Confidence**
**(By Plaintiff and the WSFS Pennsylvania Subclass Against Defendant WSFS)**

134.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

135.     Plaintiff and Class Members are named beneficiaries and legal owners of accounts administered by WSFS.

136.    In administering those accounts, WSFS collected, maintained, and used Plaintiff's and Class Members' NPPI, including names, social security numbers, contact details, identifying information, decedent-linkage data, account balances, and internal account identifiers (e.g., file/case numbers).

137.    By collecting and maintaining beneficiaries' NPPI in connection with these accounts, WSFS stood in a relationship of confidence with Plaintiff and the Class. Beneficiaries and decedents reasonably expected WSFS would use NPPI solely for legitimate account-administration purposes necessary to effectuate transfer of ownership and control and would keep it confidential from third parties.

138.    WSFS never provided notice to Plaintiff or Class Members that WSFS intended to, or did in fact, disclose Plaintiff's and Class Members' NPPI to any commissioned "recovery" vendor, including Dunbar, as required by law.

139.    WSFS owed duties of confidence to safeguard NPPI and to refrain from disclosing or using it beyond limited, necessary servicing in aid of account transfer.

140.    WSFS breached those duties by disclosing beneficiaries' NPPI to a commissioned "recovery" vendor (including Dunbar and/or similar vendors) without consent or adequate authorization and for the vendor's independent commercial use—including to identify and solicit beneficiaries for a contingency-fee "recovery" process—rather than for a constrained, one-time administrative function.

141.    The disclosure exceeded any permissible servicing purpose because, *inter alia*, the vendor (a) operated on a contingency-fee model for its own account, (b) used NPPI to target and pressure beneficiaries with fee-based outreach, (c) retained and deployed NPPI for marketing

rather than a strictly limited operational task, and (d) continued to use the NPPI and to solicit business from Plaintiff after the termination of the relationship with WSFS.

142.    The disclosure was unconsented, unnecessary to legitimate administration, and inconsistent with beneficiaries' reasonable expectations of confidentiality in NPPI held by their bank.

143.    As a direct and proximate result, Plaintiff and the Class suffered damages, including economic damages such as loss-of-use/interest on account balances during vendor-induced delay and incidental out-of-pocket costs (notary, postage, document handling) and non-economic harm including invasion of privacy-type injuries and distress arising from the unprivileged disclosure and ensuing solicitations.

144.    WSFS' acts and omissions were intentional or, at minimum, reckless or negligent, and constituted unprivileged disclosures and misuse of confidential information obtained within a relationship of confidence. Punitive damages are warranted to deter similar conduct.

145.    Plaintiff also seeks an injunction requiring WSFS to:

a.    Cease and desist sharing beneficiary NPPI with commission-based "recovery" vendors;

b.    Delete and certify deletion of any beneficiary NPPI previously shared with such vendors;

c.    Refrain from any fee-based outreach absent prominent, contemporaneous disclosure of a free, direct transfer option from the bank or state unclaimed-property administrator; and

d.  Prohibit netting or deducting any vendor commission from account value owed to beneficiaries, together with appropriate restitution/disgorgement and further equitable relief as the Court deems just and proper.

**COUNT VII**
**Aiding and Abetting Breach of Confidence**
**(By Plaintiff and the Dunbar Pennsylvania Subclass Against Defendant Dunbar)**

146.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

147.    As alleged above, WSFS owed Plaintiff and Class Members a duty of confidence with respect to their nonpublic personal information ("NPPI") collected and maintained in connection with the administration and transfer of their accounts, and WSFS breached that duty by disclosing beneficiaries' NPPI to a commissioned "recovery" vendor for that vendor's independent commercial use.

148.    Dunbar knew—from the nature of the data it requested and received, the context of its engagement, and its own solicitation materials—that the NPPI originated from a bank–customer/beneficiary relationship, was nonpublic and sensitive, and was entrusted to the bank for limited administrative purposes, not for independent commercial solicitation.

149.    With that knowledge (or, at minimum, with willful blindness to the same), Dunbar knowingly and substantially assisted WSFS' breach of confidence by, *inter alia*:

a.  Requesting, receiving, and retaining beneficiaries' NPPI from WSFS, including decedent-linkage and internal account identifiers, for use in Dunbar's contingency-fee marketing;

b.  Using the NPPI to identify, target, and solicit beneficiaries for a fee-based "recovery" process, rather than for any constrained, ministerial servicing function;

33

    c.   Pressuring beneficiaries with urgency/complexity messaging that leveraged the NPPI to channel them into Dunbar's paid services; and

    d.   Deploying the NPPI for Dunbar's own account and commercial gain, thereby enabling, amplifying, and profiting from the bank's wrongful disclosure.

150.    Dunbar's assistance was a substantial factor in the commission of the breach of confidence and in the resulting harms to Plaintiff and the Class, including loss of control over NPPI, exposure to unwanted and coercive solicitations, delays in the retitling/transfer of their accounts, loss-of-use/interest on account balances during delay, and incidental out-of-pocket costs.

151.    Dunbar's conduct was intentional, or at minimum reckless, and carried out in conscious disregard of Plaintiff's and Class Members' rights in their confidential information.

152.    By reason of the foregoing, Dunbar is liable for aiding and abetting WSFS' breach of confidence.

153.    Plaintiff and the Class are entitled to compensatory damages, including economic (e.g., loss-of-use/interest and incidentals) and, where proven, non-economic damages associated with the invasion of privacy and misuse of NPPI.

154.    Plaintiff and the Class further seek punitive damages based on Dunbar's willful or reckless disregard for their rights.

155.    In addition, Plaintiff seeks an order requiring Dunbar to:

    a.   Cease and desist from using, disclosing, or soliciting beneficiary NPPI obtained from WSFS or any other bank;

    b.   Delete and certify deletion of all beneficiary NPPI in its possession, custody, or control; and

c.   Refrain from any outreach to beneficiaries premised on client-derived NPPI unless and until the beneficiary has been provided a clear, contemporaneous disclosure of a free, direct transfer pathway through the bank (or relevant administrator) and has given informed, written consent.

## PRAYER FOR RELIEF

### A.  Certification

156.   Certify the proposed Classes and Pennsylvania Subclasses under Fed. R. Civ. P. 23(a), (b)(2), and/or (b)(3);

157.   Appoint Plaintiff as representative of the Classes and appoint Plaintiff's counsel as Class Counsel.

### B.  Declarations

158.   Declare that WSFS' practices described herein breach their contractual and implied-covenant obligations to beneficiaries;

159.   Declare that WSFS' failure to provide periodic statements to EFT-enabled beneficiary accounts after the Transfer Trigger violates the Electronic Fund Transfer Act and Regulation E;

160.   Declare that disclosing beneficiary NPPI to commissioned "recovery" vendors for those vendors' independent commercial use constitutes a breach of confidence.

### C.  Injunctive and Equitable Relief

161.   Order WSFS to promptly transfer ownership and control of beneficiary accounts upon reasonable proof of the Transfer Trigger, and to provide the ordinary incidents of ownership (including exclusive access, credentials, statements, and communications);

162.    Enjoin Defendants from conditioning or steering transfers through fee-based vendors;

163.    Require conspicuous disclosure of a free, direct transfer option in any beneficiary outreach;

164.    Enjoin WSFS from sharing NPPI with commissioned "recovery" vendors; order deletion and certified destruction of any beneficiary NPPI already shared;

165.    Require WSFS to implement and maintain reasonable recordkeeping and beneficiary-contact procedures to effectuate timely transfers and accurate escheat reporting;

166.    Order restitution/disgorgement of all fees, vendor commissions, and other benefits wrongfully retained or earned in connection with the conduct alleged.

### D.  Damages

167.    Compensatory damages for Plaintiff and Class Members, including but not limited to: (a) restoration of funds wrongfully withheld or denied; (b) loss-of-use/interest for delay in transfer and wrongful control; (c) loss of use/interest for accounts never recovered or transferred (d) wrongfully assessed fees/charges; (e) loss of funds from unauthorized charges or withdrawals; and (f) incidental out-of-pocket costs;

168.    Statutory damages under EFTA (15 U.S.C. § 1693m), including treble damages, actual damages, and, for the class, statutory damages up to the cap permitted by § 1693m(a)(2)(B);

169.    Punitive damages where permitted (including on the breach-of-confidence and aiding-and-abetting claims) for willful or reckless misconduct.

### E.  Fees and Interest

170.    Attorneys' fees and costs as allowed by law (including EFTA § 1693m(a)(3) and any applicable state statutes), and under the common-fund/common-benefit doctrines;

171.    Pre- and post-judgment interest at the maximum rate permitted by law.

**F.  Further Relief**

172.    Such other and further relief as the Court deems just and proper to remedy and prevent the unlawful practices described herein.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury of all issues so triable under law.

<u>**LOCAL RULE 53.2 CERTIFICATION**</u>

Pursuant to Local Rule 53.2(3)(C)(1) of the Local Rules of Civil Procedure, Plaintiff and his counsel hereby certify that the damages sought herein exceed $150,000.00, exclusive of interest and costs.

Respectfully submitted,

*/s/ Kevin Trainer*

Kevin Trainer (PA Id. 326064)
Irv Ackelsberg (PA Id. 23813)
LANGER GROGAN & DIVER PC
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660
Fax: (215) 320-5703
ktrainer@langergrogan.com
iackelsberg@langergrogan.com

Michael B. Homer (*pro hac vice* application forthcoming)
Constantine P. Economides (*pro hac vice* application forthcoming)
DYNAMIS LLP
175 Federal Street, Suite 1200

Boston, MA 02110
(617) 693-9732
mhomer@dynamisllp.com
ceconomides@dynamisllp.com

Tyler Finn (*pro hac vice* application
forthcoming)
Lance Aduba (*pro hac vice*
application forthcoming*)*
Lynn Fouad (*pro hac vice*
application forthcoming*)*
DYNAMIS LLP
11 Park Place, 4th Floor
New York, NY 10007
(212) 204-2757
tfinn@dynamisllpl.com
laduba@dynamisllp.com
lfouad@dynamisllp.com

*Attorneys for Plaintiff Elan Pavlov*